## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| OLACHUKWU NNADILI, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 02-1620 (ESH) |
| ) | |
| CHEVRON U.S.A. INC. ) | |
| ) | |
| Defendant. ) | |
| _____) | |
| ) | |
| MARY ABNEY, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 03-1593 (ESH) |
| ) | |
| CHEVRON U.S.A. INC. ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## MEMORANDUM OPINION

Plaintiffs in these consolidated cases assert various claims against Chevron U.S.A. Inc.

("Chevron") based upon the presence of petroleum hydrocarbons in the soil and groundwater

below certain properties in an area of Washington, D.C. known as Riggs Park.  They contend that

the contamination resulted from the discharge or release of gasoline from a retail service station

formerly owned and operated by Chevron and seek damages for diminution in the value of their

properties and for emotional distress.  They also seek injunctive relief under the Resource

Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq*. ("RCRA").

Chevron has moved for partial summary judgment with respect to the following claims:

(1) emotional distress damages; (2) common law strict liability; (3) statutory claims under the RCRA; and (4) claims by individuals whose properties are not situated over subsurface contamination.  For the reasons set forth below, the Court will grant summary judgment as to the claims for strict liability and for violation of the RCRA, but will deny Chevron's motion in all other respects.

## BACKGROUND

Plaintiffs include approximately 500 current and former residents of, or property owners within, the Riggs Park neighborhood of Washington, D.C.  (*See Nnadili* Fifth Amended Complaint ("*Nnadili* Compl.") ¶¶ 9-129; *Abney* Third Amended Complaint ("*Abney* Compl.") ¶¶ 7-169.)  According to plaintiffs, from approximately 1956 through June 21, 1993, Chevron, or its predecessor-in-interest, owned and operated a retail gasoline service station at 5801 Riggs Road in Chillum, Maryland, which is on the Maryland side of the border between Maryland and Washington, D.C.  (*Nnadili* Compl. ¶¶ 130, 131; *Abney* Compl. ¶¶ 171, 172.)[1]  They allege that during the time that Chevron owned and operated the service station, gasoline was discharged or released into the ground from the station's underground storage tanks ("USTs").  (*See*, *e.g.*, *Nnadili* Compl. ¶¶ 133, 134, 139, 140, 144, 146, 149, 150; *Abney* Compl. ¶¶ 2, 3, 176-78.)  Plaintiffs further allege that the gasoline subsequently migrated into the Riggs Park neighborhood, contaminating the air, soil, and groundwater of the properties currently or formerly owned or occupied by plaintiffs.  (*See*, *e.g.*, *Nnadili* Compl. ¶¶ 136, 144; *Abney* Compl. ¶¶ 3, 178, 186, 187, 189.)

---

[1] Chevron is a Pennsylvania corporation headquartered in California.  (Answer to *Nnadili* Compl. ¶ 130.)

In their initial complaints, plaintiffs asserted claims for wrongful death, personal injury, and medical monitoring, in addition to the instant claims for property and emotional distress damages.[2]  On October 4, 2004, however, after air sampling conducted by Chevron indicated that the air quality in selected Riggs Park homes did not exceed Environmental Protection Agency ("EPA") thresholds, plaintiffs voluntarily dismissed all claims predicated on evidence of actual exposure to gasoline constituents.  (*See* Oct. 4, 2004 Stipulated Order ("Stip. Order").)  Specifically, plaintiffs stipulated as follows:

> All plaintiffs agree that they do not now allege and will not allege or attempt to prove in these actions that any plaintiff was exposed to petroleum hydrocarbons or other contaminants of a nature, intensity and duration that can be linked through valid scientific evidence to personal injury or to a risk of injury or death.  Nor will plaintiffs attempt to argue or prove that any emotional distress alleged to have been suffered by any plaintiff is the result of any actual exposure to petroleum hydrocarbons or other contaminants.  In addition, plaintiffs will not attempt to argue or prove that a valid scientific basis exists for any potential for exposure.

(*Id.* ¶ 1.)  In connection with this stipulation, plaintiffs also sought – and were granted – leave to file their current amended complaints, which do not include claims for personal injury, wrongful death, or medical monitoring.  (*Id.* ¶ 2.)  As a result, plaintiffs are seeking – based on claims of trespass, nuisance, negligence, and common law strict liability – damages only for diminution in the value of their properties and for emotional distress, as well as injunctive relief under the RCRA.

On December 5, 2005, prior to the close of discovery, the Court entered a Revised Stipulated Scheduling Order pursuant to which Chevron filed the motion for partial summary

---

[2] Only the *Nnadili* plaintiffs asserted claims for wrongful death.

judgment that is presently before the Court.  As agreed to and proposed by the parties, fact and

expert discovery has been stayed pending disposition of the instant motion. (Dec. 5, 2005

Revised Stipulated Scheduling Order ¶ 4.)  The Revised Stipulated Scheduling Order further

provides that additional dispositive motions, as appropriate, shall be permitted following the

completion of discovery.  (*Id.* ¶ 5.)

## ANALYSIS

### I.       Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary

judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on

file, and affidavits show that there is no genuine issue of material fact, and that the moving party

is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  To be material, the fact must be capable of affecting the outcome of the litigation, and to

be genuine, the issue must be supported by admissible evidence sufficient for a reasonable trier

of fact to find in favor of the non-moving party.  *Id.* at 247-48; *see also Laningham v. U.S. Navy*,

813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

To avoid summary judgment the non-moving party's opposition must consist of more

than mere unsupported allegations or denials and must be supported by affidavits or other

competent evidence setting forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  The non-moving party

must provide evidence that would permit a reasonable jury to find in the non-moving party's

favor.  *Laningham*, 813 F.2d at 1241.  "If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations

omitted).   Nevertheless, "because summary judgment is a drastic measure, courts should grant it

with caution so that no person will be deprived of his or her day in court to prove a disputed

material factual issue." *Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C. Cir.

1986).   For this reason, in considering a motion for summary judgment, the "evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty*

*Lobby*, 477 U.S. at 255; *see also Wash. Post Co. v. U.S. Dep't of Health and Human Servs.,* 865

F.2d 320, 325 (D.C. Cir. 1989).

## II.     Choice of Law

"When deciding state-law claims under diversity or supplemental jurisdiction, federal

courts apply the choice-of-law rules of the jurisdiction in which they sit." *Ideal Elec. Sec. Co.,*

*Inc. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997).   The District of Columbia has

adopted the "substantial interest" approach to choice of law questions.   *Greycoat Hanover F*

*Street Ltd. P'ship v. Liberty Mut. Ins. Co.*, 657 A.2d 764, 767-68 (D.C. 1995).   When faced with

a choice of law in an action sounding in tort, a court in the District of Columbia will "balance the

competing interests of the two jurisdictions, and apply the law of the jurisdiction with the more

'substantial interest' in the resolution of the issue." *Lamphier v. Wash. Hosp. Ctr.*, 524 A.2d

729, 731 (D.C. 1987); *see also Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir.

2004).   To determine which jurisdiction maintains a more substantial interest, District of

Columbia courts consider the factors listed in Section 145 of the Restatement (Second) of

Conflict of Laws (1971).   *See Herbert v. Dist. of Columbia*, 808 A.2d 776, 779 (D.C. 2002);

*Estrada v. Potomac Elec. Power Co.*, 488 A.2d 1359, 1361 n. 2 (D.C. 1985).  These include: (1) the place of injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, place of incorporation and place of business of the parties; and (4) the place where the relationship between the parties is centered.  Restatement (Second) of Conflict of Laws § 145(2).

Applying these factors to the instant facts, the Court finds that between the District of Columbia and Maryland, the District of Columbia has the greater interest in the outcome of this litigation.[3]  While Chevron's conduct occurred mainly in Maryland, where its former service station and USTs are situated, and a handful of plaintiffs currently reside in that state, all of the alleged contamination at issue in this litigation occurred in the District of Columbia, all of the alleged injuries were sustained in the District of Columbia, and the overwhelming majority of plaintiffs still reside in the District of Columbia.  Accordingly, the Court concludes that all of the tort claims asserted in these consolidated cases are governed by the laws of the District of Columbia.

## III.   Emotional Distress Damages

Chevron first contends that plaintiffs cannot recover damages for emotional distress as a matter of law.  Relying primarily on case law involving claims for intentional and negligent infliction of emotional distress, Chevron argues that courts in the District of Columbia

---

[3] Although Chevron acknowledges that this litigation "raises questions about the choice of law," it nevertheless contends that "[t]hose questions are immaterial to this motion, however, because the laws of both Maryland and [the District of Columbia] entitle Chevron to judgment on the selected claims."  (Def.'s Mem. at 11.)  Put another way, Chevron necessarily acknowledges that the choice is limited to the laws of Maryland or the District of Columbia, but it takes no position as to which law in fact should apply.  Moreover, while Chevron is a Pennsylvania corporation headquartered in California, neither Chevron nor plaintiffs argue that Pennsylvania or California law should apply.

consistently have barred such claims absent proof of physical injury or physical endangerment. (*See* Def.'s Mem. at 14-17.)  To the extent that District of Columbia case law does not expressly address claims for emotional distress damages based on property damage alone, however, Chevron further asserts that the Court should look to the law of Maryland for guidance.  *See Conseco Indus., Ltd. v. Conforti & Eisele, Inc.*, 627 F.2d 312, 315-16 (D.C. Cir. 1980); *Whitaker v. Wash. Metro. Area Transit Auth.*, 889 F. Supp. 505, 506-07 (D.D.C. 1995).

According to Chevron, plaintiffs' claims for emotional distress damages cannot survive under established Maryland precedent.  (*See* Def.'s Mem. at 11-14.)  In support of it position, Chevron principally relies on the Maryland Court of Appeals decision in *Dobbins v. Wash. Suburban Sanitary Comm'n*, 658 A.2d 675 (Md. 1995).  In that case, the court held that "a plaintiff cannot ordinarily recover for emotional injuries sustained solely as a result of negligently inflicted damage to the plaintiff's property." *Id.* at 680.  The court reasoned that "emotional injuries are not the 'consequences that ensue in the ordinary and natural course of events' from negligently inflicted property damage," and that "such injuries should not be contemplated, in light of all the circumstances, 'as a natural and probable consequence' of a negligently inflicted injury to property." *Id.* at 679  (quoting *State v. Baltimore Transit Co.*, 80 A.2d 13, 18 (Md. 1951)).  For additional support, Chevron points to instances where the Maryland Court of Appeals has refused to award emotional distress damages based on property damage caused by trespass. *See Wolf v. Levitt & Sons, Inc.*, 298 A.2d 374, 377-78 (Md. 1973); *Zeigler v. F St. Corp.*, 235 A.2d 703, 705 (Md. 1967).

Finally, Chevron argues that the October 4, 2004 Stipulated Order independently bars plaintiffs' claims for emotional distress damages because it eliminates any factual basis for such

claims.  (*See* Def.'s Reply at 6-7.)  According to Chevron, not only have plaintiffs stipulated that

they have suffered no emotional distress from actual exposure to contamination, but they also

have stipulated that (1) no plaintiff has ever been exposed; and (2) no plaintiff will have the

potential for exposure.  Chevron thus argues that the Stipulated Order, as a matter of undisputed

fact, removes any reasonable basis for emotional distress.

Stated simply, Chevron contends that property damage alone cannot serve as a basis for

recovering damages for emotional distress.  The Court disagrees.

Under District of Columbia law, it is firmly established that a plaintiff may recover

damages for mental suffering unaccompanied by physical injury where the plaintiff sues for an

intentional tort.  *Adams v. George W. Cochran & Co., Inc.*, 597 A.2d 28, 31 (D.C. 1991); *Parker*

*v. Stein*, 557 A.2d 1319, 1322 (D.C. 1989); *Barnes v. Dist. of Columbia*, 452 A.2d 1198, 1199

(D.C. 1982).  It is also clear that trespass is an intentional tort.  *E.g.*, *Cleveland Park Club v.*

*Perry*, 165 A.2d 48, 488 (D.C. 1960).  Although the parties have not cited – and the Court has

been unable to find – a District of Columbia decision addressing the availability of emotional

distress damages in a trespass case, the decision in *Parker* is instructive.  In that case, the Court

of Appeals for the District of Columbia, applying the established rule regarding intentional torts,

concluded that emotional distress damages are available in an action for conversion of personal

property.  *Parker*, 557 A.2d at 1322-23.  Here, the Court can find no meaningful distinction

between personal and real property to suggest that courts in the District of Columbia would

permit recovery of emotional distress damages for intentional torts involving personal, but not

real, property damage.  Accordingly, the Court concludes that emotional distress damages are

recoverable for trespass actions under District of Columbia law.[4]

Furthermore, with respect to all of plaintiffs' tort claims, including those sounding in trespass, the Court concludes that District of Columbia law permits emotional distress as an element of damages because District of Columbia courts follow the Restatement (Second) of Torts. (*See* Pl.'s Mem. at 14-15 nn.14-16 and cases cited therein.) Section 905 of the Restatement, which applies to all torts, provides that: "Compensatory damages that may be awarded without proof of pecuniary loss include compensation (a) for bodily harm, and (b) for emotional distress." Restatement (Second) of Torts § 905 (1979). Section 929 of the Restatement, which pertains specifically to damages available in actions sounding in trespass, provides in pertinent part: "If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for . . . ©) discomfort and annoyance to him as an occupant." *Id.* § 929.

As Chevron accurately asserts, there is scant case law from the District of Columbia applying Sections 905 and 929. (*See* Def.'s Reply at 5.)[5] Nevertheless, the District of

---

[4] Although the Court concludes that emotional distress damages are available in trespass cases under District of Columbia law as a general matter, the decision in *Parker* further supports the Court's conclusion in the context of the trespass claims at issue in these cases. In *Parker*, the court noted that its decision to apply the established rule regarding intentional torts in the case before it was buttressed by the fact that "Parker's evidence, if credited, shows that the defendant was guilty of a willful or wanton tort committed under circumstances of insult and contumely so that mental disturbance was a reasonably foreseeable consequence." *Parker*, 557 A.2d at 1323 (citation omitted). Here, plaintiffs have alleged that the conduct giving rise to their trespass (and nuisance) claims was willful and wanton and was undertaken with a reckless disregard for plaintiffs' safety. (*Nnadili* Compl. ¶¶ 177, 180, 182, 210, 213-15, 225; *Abney* Compl. ¶¶ 203-06, 208, 210, 213, 214, 222, 224, 225.)

[5] In such situations, "the District of Columbia courts [typically] look to the law of Maryland for guidance." *Sigmund v. Progressive N. Ins. Co.*, 374 F. Supp. 2d 33, 36 (D.D.C. 2005) (quoting *Conseco*, 627 F.2d at 316). In doing so, however, the Court has concluded that

Columbia's established rule that a plaintiff may recover damages for emotional distress for intentional torts, which the Court of Appeals for the District of Columbia has endorsed with respect to intentional torts involving personal property, *see Parker*, 557 A.2d at 1322-23, and the absence of any contrary suggestion with respect to real property, lead the Court to conclude that the District of Columbia would follow Sections 905 and 929 of the Restatement to permit emotional distress as an element of damages for the tort claims plaintiffs have asserted. Moreover, courts in other jurisdictions have applied these sections of the Restatement to permit emotional distress damages in tort cases similar to the instant claims. *See, e.g.*, *French v. Ralph E. Moore, Inc.*, 661 P.2d 844, 847-88 (Mont. 1983) (holding damages for mental anguish recoverable for claims trespass, nuisance, and negligence claims arising out of gasoline discharge from USTs).

Chevron's reliance on District of Columbia cases addressing causes of action for intentional and negligent infliction of emotional distress is misplaced. Plaintiffs are not seeking damages for the separate torts of intentional or negligent infliction of emotional distress.[6] Rather, plaintiffs merely claim emotional distress as an element of damages for the traditional tort claims they have asserted – *e.g.*, trespass, nuisance, negligence. Chevron, in fact, acknowledges as

the laws of Maryland and the District of Columbia diverge. *Compare Abbott v. Forrest Hill State Bank*, 483 A.2d 387, 391 (Md. Ct. Spec. App. 1984) (conversion of personal property does not give rise to emotional distress damages) *with Parker*, 557 A.2d at 1322-23 (emotional distress damages are available in action for conversion of personal property).

[6] As Chevron accurately asserts, in causes of action for negligent infliction of emotional distress, courts in the District of Columbia have held that only plaintiffs within the so-called "zone of danger" can recover damages. *See Williams v. Baker*, 572 A.2d 1062, 1067 (D.C. 1990). That is to say, the courts have "adopted the zone of danger approach . . . as the basis for liability" in such actions. *Id.* at 1069.

much.  (*See* Def.'s Mem. at 4 ("In their most recent amended complaints, plaintiffs dropped their claims for intentional and negligent infliction of emotional distress."); *id.* at 4 n.2 (whereas prior complaints asserted "*claims* for intentional and negligent infliction of emotional distress," current versions assert "emotional distress *damages* as part of *other claims*) (emphasis added).)

The distinction between intentional and negligent infliction of emotional distress as independent causes of action and emotional distress as an element of damages for traditional tort claims is illustrated by the decision in *Adams*, *supra*.  In that case, the Court of Appeals for the District of Columbia rejected plaintiff's claim for intentional infliction of emotional distress, because the plaintiff had failed to prove all of the elements for such a cause of action,[7] but permitted the plaintiff to claim, as an element of damages for the tort of wrongful termination, "compensation for any emotional distress or mental anguish resulting from the discharge." *Adams*, 597 A.2d at 35.  In other words, the court permitted emotional distress as an element of damages for a tort claim, even though the plaintiff could not meet the requirements of an independent cause of action for intentional infliction of emotional distress.  *Id.*; *see also Williams v. Baker*, 572 A.2d 1062, 1064 (D.C. 1990) ("This jurisdiction's requirement that to be compensable [in claims for negligent infliction of emotional distress] mental suffering must flow from physical injury is consistent with the historic reluctance of the common law to allow recovery for mental distress *other than as an element of damages when an independent tort is established*.") (emphasis added).

---

[7] Under District of Columbia law, the elements of a claim for intentional infliction of emotional distress are "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (internal quotations and citations omitted).

Finally, Chevron's arguments regarding the Stipulated Order are without merit.  As

plaintiffs contend, the Stipulated Order has reduced their claims for emotional distress damages

to those arising from:

> (1) fear of the unknown, consisting of (a) fear and anxiety over
> whether plaintiffs or their families were exposed to toxic chemicals
> during the 15 year period from 1989, when the release was
> discovered, to 2004, when the air test results were disclosed; and
> (b) fear and anxiety over future exposure to toxic chemicals; (2)
> fear and anxiety over any possible diminution in value of their
> homes; (3) fear, anxiety, and annoyance resulting from the loss of
> the use and enjoyment of certain parts of their properties; and (4)
> humiliation over the contaminated state of their neighborhood.

(Pl.'s Opp'n at 7.)  Chevron does not argue that these assertions are directly contradicted by the

Stipulated Order but instead argues that plaintiffs' claims are "irrational and unreasonable" in

light of the Order.  (Def.'s Reply at 7.)  Questions about the reasonableness of plaintiffs' alleged

fear and anxiety, however, are for the jury.

Accordingly, the Court will deny Chevron's motion for partial summary judgment with

respect to plaintiffs' damage claims based on emotional distress.


**IV.     Common Law Strict Liability**

Plaintiffs allege that Chevron's storage of gasoline in USTs at the specific service station

at issue constitutes an abnormally dangerous activity, thus giving rise to claims for common law

strict liability.  (*Nnadili* Compl. ¶ 186; *Abney* Compl. ¶ 230.)  Chevron argues otherwise, and the

Court agrees.

In *National Telephone Cooperative Ass'n v. Exxon Corp.*, 38 F. Supp. 2d 1 (D.D.C.

1998), which is similar to these cases, the district court concluded that the Court of Appeals for

the District of Columbia "would likely follow the majority of jurisdictions that have held that a

defendant does not engage in abnormally dangerous conduct by storing gasoline [in] USTs in

commercial environments in which leaks are not likely to jeopardize human safety." *Id.* at 8; *see*

*also id.* ("Where USTs are buried beneath gasoline stations located in commercial settings, the

overwhelming majority of courts have concluded that such conduct is not 'abnormally

dangerous.'") (citing *Arlington Forest Assocs. v. Exxon Corp.*, 774 F. Supp. 387, 391 (E.D. Va.

1991); *Hudson v. Peavey Oil Co.*, 566 P.2d 175, 178 (Or. 1977); *Smith v. Weaver*, 665 A.2d

1215, 1219-20 (Pa. Super. Ct. 1995); *Walker Drug Co. v. La Sal Oil Co.*, 902 P.2d 1229, 1233

(Utah 1995); *Grube v. Dunn*, 570 N.W.2d 851, 856-57 (Wis. 1997)).  Applying the factors set

forth in the Restatement for determining whether an activity is abnormally dangerous, the Court

reasoned:

> Unlike archetypical abnormally dangerous activities such as blasting,
> there is no evidence to suggest "that the risk of seepage [from USTs]
> cannot be eliminated by the exercise of reasonable care, or that the
> harm to be anticipated from the underground seepage of gasoline is
> 'grave.' " *Hudson*, 566 P.2d at 178; *see also Smith*, 665 A.2d at 1220
> ("Gasoline and other petroleum products can be stored and dispensed
> safely with reasonable care . . . ."); *Walker Drug Co.*, 902 P.2d at
> 1233 ("[W]e are not convinced that the risk cannot be eliminated by
> the exercise of reasonable care."); *Grube*, 570 N.W.2d at 857
> ("Absent negligence or application of an outside force, use of a USTS
> does not create a high degree of risk of harm to the person, land or
> chattels of another.  Moreover those risks that do exist can be
> minimized by the exercise of reasonable care by the owner or
> possessor of the tank.").  Perhaps because reasonable care will
> typically guard against any harm that USTs may inflict, "the storage
> of [gasoline] in tanks is a common use and is valuable to a modern
> society." *Smith*, 665 A.2d at 1220; *see also Walker Drug Co.*, 902
> P.2d at 1233 ("[T]he operation of a gas station is common,
> appropriate, and of significant value to the community."); *Arlington
> Forest*, 774 F. Supp. at 391 (holding that gasoline stations fulfill
> essential transportation needs in modern society).

*Id.*

Here too, application of the Restatement factors[8] demonstrates that Chevron's conduct was not abnormally dangerous as a matter of law.  Because plaintiffs derive their water from the District of Columbia's water utility, rather than from the groundwater in the area, there does not exist a high degree of risk that the utilization of USTs at the service station location will cause great harm to plaintiffs or others through exposure to contaminated water.  (*See*, *e.g.*, Def.'s Ex. 6 (EPA Press Release, Dec. 11, 2002) ("Since the drinking water supply to the residential area is from a public water supply, there is no known risk to the drinking water from contamination.").  Indeed, plaintiffs have stipulated that there exists no possibility of harmful exposure to contaminants stemming from Chevron's operations.  (*See* Stip. Order ¶ 1.)  There is also no evidence in the record that gasoline cannot be stored in USTs safely with reasonable care.  And finally, although the service station is located in close proximity to a residential neighborhood, it is also situated among other commercial properties, including several other retail gasoline service stations and a dry cleaner.

Nothing in *Brennan Construction Co. v. Cumberland*, 29 App. D.C. 554 (1907), and

---

[8] These factors are:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts § 520 (1977).

-14-

*Yommer v. McKenzie*, 257 A.2d 138 (Md. 1969), on which plaintiffs primarily rely, mandates a

contrary result.  In *Brennan Construction*, the defendant "constructed, almost over the bed of the

[Potomac River], two large tanks, and stored therein some 14,000 gallons of petroleum residuum,

and permitted a considerable quantity to escape to the river, remain thereon for weeks, and injure

innocent persons." *Brennan Constr. Co.*, 29 App. D.C. at 561.  Here, Chevron stored gasoline in

USTs away from any potable water supply.  In *Yommer*, the court similarly concluded that the

placement of USTs next to a residential neighborhood and "virtually on top of a family's

drinking-water well," *Nat'l Tel. Co-op. Ass'n*, 38 F. Supp. 2d at 9, constituted an abnormally

dangerous activity, *Yommer*, 257 A.2d at 138.  Again, by contrast, Chevron's USTs, while

located nearby a residential neighborhood, are not situated near any sources of drinking water

and are in an area populated with commercial enterprises.  As other courts have found, "USTs

located beneath the ground of gasoline stations in commercial zones are commonplace and are of

great utility to the community."  *Nat'l Tel. Co-op. Ass'n*, 38 F. Supp. 2d at 9.

Accordingly, the Court will grant Chevron's motion for partial summary judgement with

respect to plaintiffs' claims for common law strict liability and enter judgment in favor of

Chevron on Count One of the *Nnadili* Complaint and Count V of the *Abney* Complaint.

## V.      Statutory Claims Under the RCRA

Plaintiffs in the *Abney* case allege two claims under the RCRA.[9]  In Count VII of the

*Abney* Complaint, plaintiffs assert a citizen suit under § 6972(a)(1)(A) to compel Chevron to

comply with unspecified provisions of the RCRA and the regulations promulgated thereunder. In

---

[9] Plaintiffs in the *Nnadili* case have not asserted any claims under the RCRA.

-15-

Count VIII, they assert a citizen suit under § 6972(a)(1)(B) to compel Chevron to perform certain remedial measures.  Plaintiffs have, however, "withdraw[n] their claim for injunctive relief under the RCRA" (Pl.'s Opp'n at 30), because the EPA, on November 26, 2002, issued an Administrative Order, pursuant to § 6973 of the RCRA, requiring Chevron to investigate and, if necessary, to develop a remedial approach to the conditions that are the subject of this litigation. (*See* Def.'s Ex. 3 at III.)  Therefore, because plaintiffs have abandoned these claims, the Court will grant Chevron's motion for partial summary judgment with respect to Counts VII and VIII of the *Abney* Complaint.

## VI.    Claims of Individuals Whose Properties Do Not Overlie Subsurface Contamination

According to Chevron, at least some plaintiffs own or reside in homes that are not situated over the subsurface contamination at issue in this litigation.  (Def.'s Facts ¶ 13.)  For the purposes of its motion, Chevron identifies six plaintiffs who it contends fall into this category: (1) Mary and Eunice Minor, of 828 Jefferson Street, N.E., Washington, DC; (2) Jacob and Gloria Carey, formerly of 5204 12th Street, N.E., Washington DC; and (3) Tometta and Fred Dendy, of 618 Oglethorpe Street, N.E., Washington, DC.  (*Id.*)  In support of this contention, Chevron relies on certain maps purportedly published by the U.S. Army Corps of Engineers, which tend to show that the properties of these six plaintiffs "and others" are not situated over the plume of contamination.  (*Id.*; *see also* Def.'s Ex. 5.)[10]  Chevron also notes that, instead of claiming that

_____

[10] Although, "[g]iven the state of discovery," Chevron identifies only three such properties and six such plaintiffs, it estimates "that more than 50 out of approximately 200 properties at issue in this case are not situated over the plume, and that more than 100 out of approximately 500 plaintiffs allegedly own or reside at properties that are not over the plume." (Def.'s Mem. at 29.)

their properties directly overlie subsurface contamination, these six plaintiffs merely allege that their properties are "located adjacent to the underground Plume of contamination." (*Nnadili* Compl. ¶¶ 115, 116, 125.)

Chevron argues that it is entitled to judgment as a matter of law on all claims asserted by these six plaintiffs and others whose properties are not located over the subsurface contamination. (*See* Def.'s Mem. at 29-33.) According to Chevron, a party cannot recover damages for alleged diminution in value based upon mere proximity to environmental contamination. Relying primarily on case law from other jurisdictions, Chevron argues that a plaintiff either must prove actual physical impact upon the subject property, *see*, *e.g.*, *Adams v. Star Enters.*, 51 F.3d 417, 422-25 (4th Cir. 1995) (Virginia law); *Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 829 (5th Cir. 1993), *cert. denied*, 510 U.S. 1117 (1994) (Mississippi law), or substantial interference with the use and enjoyment of the property, *see*, *e.g.*, *Exxon v. Yarema*, 516 A.2d 990, 1004 (Md. Ct. Spec. App. 1986), in order to maintain a valid claim for tort damages. Chevron asserts that those plaintiffs whose properties are not situated over the plume cannot prove the requisite impact, and that under District of Columbia law, diminution of market value alone, with no accompanying personal or property damage, does not constitute an unreasonable interference with the use and enjoyment of land. *See Nat'l Tel. Coop. Ass'n*, 38 F. Supp. 2d at 14 (so holding in context of private nuisance claim).

Without considering the merits of Chevron's legal arguments, the Court must deny its motion as to these claims because Chevron has failed to submit admissible evidence to establish, as a factual matter, that one or more plaintiffs own or reside on property that is not situated over subsurface contamination. It is "well-settled that only admissible evidence may be considered by

the trial court in ruling on a motion for summary judgment." *Bortell v. Eli Lilly Co.*, 406 F.

Supp. 2d 1, 11 (D.D.C. 2005) (quoting *Beyne v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181

(9th Cir. 1988)); *see also Simpkins v. Wash. Area Metro. Transit Auth.*, 2 F. Supp. 2d 52, 56-57

(D.D.C. 1998).  The maps on which Chevron relies are presented without any affidavit

explaining who prepared them, how they were prepared, and whether they attempt to delineate

the current extent of contamination.[11]  Without anything to substantiate their authenticity, the

maps would be inadmissible at trial to establish the plume boundaries and thus cannot be

considered for that purpose on a motion for summary judgment.  *See Carmona v. Toledo*, 215

F.3d 124, 131 (1st Cir. 2000) ("To be admissible at the summary judgment stage, documents

must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).")

(internal quotations and citation omitted); *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)

(same); *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987).

     While the Court recognizes that evidence "should not be excluded on summary judgment

on hypertechnical grounds," *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989), strict

adherence to the requirements of Rule 56(e) is particularly appropriate here because the

delineation of the plume boundaries is arguably a matter of expert opinion rather than a pure

question of fact, *see id.* (unsworn expert report is not competent to be considered on a motion for

---

[11] Because certain evidence on which Chevron otherwise relies establishes that (1) the contamination at issue in this litigation has migrated from the service station location into the soil and groundwater underlying the Riggs Park neighborhood; and (2) at various times the full extent and nature of the soil and groundwater contamination was unknown (*see, e.g.*, Def.'s Ex. 3 at IV.E & F), the Court finds that certain *Nnadili* plaintiffs' assertion that their properties were "located adjacent to the underground Plume of contamination" at the time that the *Nnadili* Complaint was filed does not necessarily establish that those plaintiffs' properties have not physically been impacted by contamination.  *See Liberty Lobby*, 477 U.S. at 255 ("all justifiable inferences are to be drawn" in the favor or the non-movant).

summary judgment).  To the extent that the maps were prepared by an expert, plaintiffs have not

had the opportunity to depose the expert or assess the facts and methodology on which the expert

relied to form an opinion about the scope of contamination.  Moreover, expert discovery on this

issue and others has not yet been completed in this litigation.

In short, because Chevron has failed to support its motion with admissible evidence, the

Court finds that genuine issues of material fact exist, which preclude it from granting summary

judgment on these claims.[12]

**CONCLUSION**

For the reasons presented above, Chevron's motion for partial summary judgment is

granted in part and denied in part.  Judgment shall be entered in favor of Chevron on Count One

of the *Nnadili* Complaint and Counts V, VII, and VIII of the *Abney* Complaint.  Its motion is

denied in all other respects.  A separate Order accompanies this Memorandum Opinion.

_____s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: June 1, 2006

---

[12] Even though plaintiffs have not submitted any evidence to oppose Chevron's motion
with respect to these claims, "where the evidentiary matter in support of the motion does not
establish the absence of a genuine issue, summary judgment must be denied even if no opposing
evidentiary matter is presented." *Torres-Rosada v. Rotger-Sadap*, 335 F.3d 1, 9 (1st Cir 2003)
(citation omitted).